UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

GREEN TECHNOLOGY LIGHTING                :
CORP., a Georgia Corporation,            :
                                         :
                    *Plaintiff*,         :
                                         :
           -against-                     :         1:18-cv-01799 (PAC)
                                         :
LIBERTY SURPLUS INSURANCE                :         <u>**OPINION & ORDER**</u>
CORPORATION and LIBERTY                  :
INSURANCE UNDERWRITERS, INC.             :
                                         :
                    *Defendant*.         :
-------------------------------------------------------------- x

HONORABLE PAUL A. CROTTY, United States District Judge:

This is a case in which the Plaintiff got what it paid for.  In late 2015, Green Technology

Lighting Corporation ("Plaintiff," or "GTLC") received notice that certain light bulbs it had sold

to Menard did not work as they were supposed to, and need to be recalled.  When the bulbs were

recalled, GTLC had to give Menards new bulbs that worked to keep the customer happy.  That

cost GTLC money, and so GTLC, wanting to keep that money, looked to the insurane policy it

had signed with Libery Surplus Insurance Company ("Defendant," or "LSIC"), specifically its

Product Recall Insurance Policy ("LSIC Policy," the "Policy").  LSIC said the Policy did not

cover the costs, and GTLC sued for breach of contract, agency liability, bad faith and estoppel.

The Defendant now moves for summary judgment, and the Plaintiff moves for partial summary

judgment.

The Policy does not provide the coverage GTLC seeks.  The Plaintiff's motion for partial

summary judgment is DENIED.  The Defendant's motion for summary judgment is GRANTED.

## BACKGROUND

### I.      Procedural Background

The Plaintiff filed its Complaint on October 16, 2017 in the District Court for the District of Idaho, asserting claims against LSIC and Liberty Insurance Underwriters, Inc. ("LIU"), as well as Insure Idaho, LLC ("Insure Idaho") and Crouse & Associates Insurance Services of Northern California ("Crouse"). (Dkt. 1, at 2). As relevant to these summary judgment motions, GTLC brought claims of bad faith, breach of contract, agency liability and estoppel against LSIC. (Dkt. 1, at 9–11).

Just over a month later, the Defendant (along with its then co-defendant Liberty Insurance Underwriters, Inc.) filed a motion pursuant to 28 U.S.C. § 1404(a) to transfer the matter to the Southern District of New York, asserting that venue was proper in this District under the forum selection clause in the LSIC Policy. (Dkt. 12, Attach. 1, at 1). That clause specified that the Policy is governed by the law of the State of New York, and that claims could be brought either in the New York State courts, or in the Southern District of New York. (Dkt. 12, Ex. C, at 10). The motion to transfer venue was opposed by both Plaintiff GTLC and defendant Insure Idaho, which argued that it was not a party to the LSIC Policy. (Dkt. 26, at 2; Dkt. 27, at 1–2). Defendant Crouse & Associates also opposed the transfer. (Dkt. 31, at 1–2).

The Idaho district court held a hearing on the motion on January 16, 2018 and ordered supplemental briefing on its suggestion that the claims against LSIC should be severed and transferred to the Southern District of New York, while the claims against the other defendants were stayed in Idaho. (Dkt. 34, at 1–2). At the end of February 2018, the Idaho court decided to grant LSIC's motion in part and deny it in part, transferring the claims against it to the Southern District of New York, while retaining jurisdiction over the claims against the remaining defendants. *Green Tech. Lighting Corp. v. Liberty Surplus Ins. Co.*, No. 1:17-cv-00432-DCN,

2

2018 WL 1053529, at *1 (D. Idaho Feb. 26, 2018).   The case was subsequently transferred to

the Southern District of New York, and assigned to this Court.  (Minute Entry dated Feb. 28,

2018).

     The Parties entered a stipulation of voluntary dismissal without prejudice as to LIU, dated

August 1, 2018.  (Dkt. 56).  The Plaintiff filed its motion for partial summary judgment and the

Defendant filed its motion for summary judgment on September 6, 2019.  (Dkts. 69, 71).

## II.   Factual Background

     LSIC is incorporated in New Hampshire with its principal place of business in

Massachusetts; GTLC is a Georgia corporation with its principal place of business in Minnesota.

(Dkt. 1, at 2).  GTLC sells energy-efficient LED light bulbs.  (Dkt. 71, Attach. 1 ¶ 1; Dkt. 73,

Attach. 2 ¶ 1).

The Agreements

     On November 16, 2014, a representative for Crouse, GTLC's wholesale insurance

broker, sent a document titled "Product Recall Insurance Application" to LSIC (the "2014

Application"), seeking coverage for the period from November 30, 2014 to November 30, 2015.

(Dkt. 71, Attach. 1 ¶ 5; Dkt. 73, Attach. 2 ¶ 5).  On the 2014 Application, GTLC indicated that it

sought $3,000,000 in product recall expense coverage and $1,000,000 in product recall liability

coverage.  (Dkt. 71, Attach. 1 ¶¶ 6–7; Dkt. 73, Attach. 2 ¶¶ 6–7).  GTLC's prior policies with

LSIC, covering 2012–2013 and 2013–2014, did not include coverage for product recall liability.

(Dkt. 71, Attach. 1 ¶ 8; Dkt. 73, Attach. 2 ¶ 8).  LSIC issued a binder of coverage for the 2014–

2015 period (the "2014 Policy") that did not cover product recall liability.  (Dkt. 71, Attach. 1 ¶¶

10–11; Dkt. 73, Attach. 2 ¶¶ 10–11).

GTLC submitted an application in November 2015, and LSIC issued the LSIC Policy at issue in this case, covering the period November 30, 2015 to November 30, 2016.  (Dkt. 71, Attach. 1 ¶¶ 12–13; Dkt. 73, Attach. 2 ¶¶ 12–13).

The LSIC Policy noted that two forms of coverage could be offered:  "Coverage Agreement A:  Product Recall Expense Coverage," and "Coverage Agreement B:  Product Recall Liability Damages Coverage."  (Dkt. 12, Ex. C, at 1).  The LSIC Policy contained the following definition of "product recall expense":

> **Product recall expense** means any of the following reasonable and necessary costs, provided such costs are incurred during the 12 month period commencing on the first day **you** become aware of the applicable **covered incident**:
>
> 1. costs to notify others of such **covered incident**, including but not limited to print, radio, television and internet notifications;
>
> 2. costs to recover **your product(s)** back to you from any purchaser, distributor, or user including handling charges;
>
> 3. costs to dispose of or destroy **your product(s)**, less any salvage or scrap value recovery, but only to the extent such disposal or destruction exceeds **your** standard disposal or destruction methods and is necessary to avoid **bodily injury** or **property damage**;
>
> 4. costs to rent additional temporary warehouse or storage space;
>
> 5. costs to utilize personall other than **your** employees to assist with such **covered incident**
>
> 6. costs for wages including overtime if any paid to **your** non-exempt hourly regular employees for work devoted exclusively to such **covered incident**; and
>
> 7. costs incurred by such personnel and/or **your** such employees, including without limitation transportation and accommodations costs, in connection with such **covered incident**.

(Dkt. 12, Ex. C, at 3–4 (emphases in original); Dkt. 71, Attach. 1 ¶ 22; Dkt. 73, Attach. 2 ¶ 22).

The LSIC Policy defines "product recall liability damages" as "any sums that **you** become legally obligated to pay as **compensatory damages** and **your defense costs** resulting

from the investigation, negotiation, settlement or defense of a **claim** or **suit**." (Dkt. 12, Ex. C, at 4 (emphases in original); Dkt. 71, Attach. 1 ¶ 23; Dkt. 73, Attach. 2 ¶ 23).

Relevant to the definition for "product recall liability," the LSIC Policy restricts "compensatory damages" to "commercial economic loss, and does not include liquidated, punitive or penalty damages." (Dkt. 12, Ex. C, at 2). Finally, the LSIC Policy includes the following notations under the header "Limits of Insurance" on the Policy's first page:

|   |   |   |
|---|---|---|
| (a) Product Recall Expenses | | |
| $3,000,000 | Each Covered Incident | |
| $3,000,000 | Aggregate Limits of Insurance | |
| | | |
| (b) Product Recall Liability | | |
| NOT COVERED | Each Covered Incident | |
| NOT COVERED | Aggregate Limits of Insurance | |
| | | |
| (c) Policy Aggregate | | |
| $3,000,000 | Each Covered Incident | |
| $3,000,000 | Aggregate Limits of Insurance | |

(Dkt. 12, Ex. C, at 1).

<u>The Recall</u>

In early 2016, within the LSIC Policy coverage period, GTLC was informed by Menards, Inc. ("Menards") that certain light bulbs were defective. Menards demanded to be made whole, and GTLC recalled the light bulbs. (Dkt. 71, Attach. 1 ¶ 14; Dkt. 73, Attach. 2 ¶ 14). Zachary Kroschel, GTLC's chief operating officer, said Menards "really pushed" for the recall. (Dkt. 69, Favate Dec'l, Ex. Q, at 7:3–9).

To make Menards whole, GTLC provided Menards with new inventory to replace the defective, recalled bulbs. (Dkt. 71, Attach. 1 ¶ 16; Dkt. 73, Attach. 2 ¶ 16). Kroschel stated that Menards "would have preferred that they receive compensation in the form of a check," but that "that was not an option, so we had to get a little more creative." (Dkt. 69, Favate Dec'l, Ex. R, at 17:8–13). GTLC elected to solve this problem by providing Menards with new light bulbs that

were equal in value to the recalled bulbs.  (*Id.* at 17:3–6).  Kroschel explained this solution in his deposition:

> Q:  And as part of the recall, Menards was looking for its purchase price to be returned to it?
>
> ***
>
> A:  In order to get our recall products back, we had to —
>
> Q:  Give them back the purchase price?
>
> A:  — provide them with something of equal value as it played out.
>
> Q: Because they purchased light bulbs from Green that didn't perform as intended, correct?
>
> A:  I think more than didn't perform as intended.
>
> Q:  Had to be recalled?
>
> A:  Had to be recalled.
>
> Q: So they didn't get what they paid for? Menards did not get what it paid for? They bought 100 light bulbs?
>
> A:  Right.
>
> Q:  And had to give them back because they were recalled?
>
> ***
>
> THE WITNESS:  They wouldn't give them back unless they were given compensation for the value.

(Dkt. 73, 56.1 Counter., Attach. 2 ¶ 13; Dkt. 69, Favate Decl., Ex. R, at 146:1–147:5).

The Claim

On February 15, 2016, LSIC acknowledged that it had received notice of a claim submitted by GTLC.  (Dkt. 71, Attach. 1 ¶ 17; Dkt. 73, Attach. 2 ¶ 17).  The claim from GTLC was adjusted by LSIC employee Stephen Murray, and approved by Patrice Williams.  (Dkt. 73, Attach. 2 ¶ 20).  In a letter dated April 22, 2016, LSIC informed GTLC that costs incurred in making Menards whole for the defective light bulbs did not constitute a "product recall expense" covered by the LSIC Policy.  (Dkt. 71 ¶¶ 17–21; Dkt. 73 ¶¶ 17–21).

## DISCUSSION

The Defendant moves for summary judgment on the ground that the plain, unambiguous language of the LSIC Policy does not cover the claimed amounts, while GTLC moves for partial summary judgment on the grounds that the same plain language does cover its losses.  (Dkt. 69, Attach. 1, at 15; Dkt. 70, Attach. 1, at 4).  The Defendant also argues that the Court should grant summary judgment in its favor on the Plaintiff's claims of bad faith, estoppel, and agency liability.  (Dkt. 69, at 21–22).

## I.     Summary Judgment Standard

The Court shall grant summary judgment in favor of a movant who "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Entry of summary judgment is required "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The requirement is that there be no *genuine* issue of *material* fact," not merely that "some alleged factual dispute between the parties" exists.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original).

On a motion for summary judgment, "[t]he moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief."  *Tilchen v. CEMD Elevator Corp.*, No. 17 Civ. 51 (PAC), 2019 WL 4640184, at * 3 (S.D.N.Y. Sept. 24, 2019) (citing *Celotex*, 477 U.S. at 323).  "The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but 'only if there is a 'genuine' dispute as to those facts.'"  *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## II.     Motions

### A.  Breach of Contract

#### 1.  New York Contract Law

Both parties agree that this Court has the power to interpret the contested provisions of the LSIC Policy as a matter of law.  *See Liberty Mut. Ins. Co. v. Fairbanks Co.*, 170 F. Supp. 3d 634, 642 (S.D.N.Y. 2016) (observing that "insurance policies are interpreted according to general rules of contract interpretation" under New York law," and that "summary judgment on the meaning of an insurance policy is appropriate when the terms of a policy are unambiguous") (citations omitted).

"Under New York Law, an insurance policy is a contract that is construed to effectuate the intent of the parties as expressed by their words and purposes."  *In re Prudential Lines, Inc.*, 158 F.3d 65, 77 (2d Cir 1998).  The initial question for this Court is "whether the contract is unambiguous with respect to the question disputed by the parties."  *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir 2002)).

"'Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation.'"  *Law Debenture*, 595 F.3d at 467 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).  The insurance policy at issue must "'be read in light of common speech and the reasonable expectations of a businessperson.'"  *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Pepsico, Inc. v. Winterhur Int'l Am. Ins. Co.*, 788 N.Y.S.2d 142, 144 (N.Y. App. Div. 2004).  Ambiguities in the language of the policy are resolved against the insurer and in favor of the insured.  *Id.*; *In re Prudential Lines*, 158 F.3d at 77.

2.  **Application**

The Plaintiff mounts two lines of argument in response to the Defendant's motion for summary judgment, and in favor of its own motion for partial summary judgment.  First, it argues that the language of the LSIC Policy is unambiguous,[1] and that the language covers the expenses at issue here.  Second, GTLC argues that LSIC improperly tries to use the classification of Product Liability Expenses as an "exclusion" to limit the scope of Product Recall Expense coverage.

Taking the latter of these two arguments first, the Plaintiff relies heavily on *Mount Vernon Fire Ins. Co. v. Belize N.Y., Inc.*, 277 F.3d 232 (2d Cir. 2002) for its argument that, as a matter of New York law, the Defendant cannot use the fact that a separate policy existed covering Product Recall Liability as an "exclusion" that permits it to reject Plaintiff's claim under the Product Recall Expense coverage in the LSIC Policy.  (Dkt. 75, at 2).

In *Mount Vernon*, the insurer appealed the district court's decision to dismiss its action for a declaratory judgment that the commercial general liability insurance policy it had issued covering bodily injury and property damage liability did not cover claims resulting from a shooting and fire that left seven people dead on the insured construction site.  *Mount Vernon*, 277 F.3d at 233–36.  The Second Circuit rejected the insurer's argument that "its risk [was] limited to carpentry operations in accordance with the classifications set forth in the Policy," and affirmed.

---

[1] The Plaintiff cites *Home Ins. Co. of Ill. (New Hampshire) v. Spectrum Info. Techs., Inc.*, 930 F. Supp. 825, 837 (E.D.N.Y. 1996) for the proposition that under New York law ambiguities in an insurance application must be construed in favor of the insured.  What that case in fact says is that "[u]nder the ordinary New York rule of disclosure . . . a court must consider whether the questions on an insurance application are 'so plain and intelligible that any applicant can readily comprehend them,'" and that if the terms are so incomprehensible as to be ambiguous, the term must be construed in favor of the insured.  *Home Ins. Co. of Ill.*, 930 F. Supp. at 837.  The Plaintiff has not put forward any facts, construed in the light most favorable to it, that in any way suggest that GTLC, a sophisticated commercial party, did not understand the terms of the application it submitted.

*Id*. at 237.   The Seond Circuit held that, under New York law, "exclusions from coverage . . . must be set forth clearly and unmistakably, not be subject to any other reasonable interpretation, and fit the particular case." *Mount Vernon*, 277 F.3d at 237.

LSIC counters with its preferred case, *Lionel Freedman, Inc. v. Glens Falls Ins. Co.*, 27 N.Y.2d 364 (1971). *Lionel Freedman* concerned the question of whether the insurer, Glens Falls, had a duty of defense or indemnity under the subject policy. *Lionel Freedman*, 27 N.Y.2d at 367. The insured in that case was a commercial tenant who was sued for negligence after a man fell down an elevator shaft on the tenant's premises and died. *Id.* at 366. The insurer refused to defend the insured, and an action for a declaratory judgment was brought, which largely concerned the policy's language under the heading "EXCLUSIONS" for any hazards arising from "elevators." *Id.* at 367. The state Court of Appeals, while noting that "[t]he obligation to defend is broader than the duty to pay," nevertheless held that, because the tenant could have but did not purchase the coverage related to negligent operation of an elevator, the insurer was under no duty to defend. *Lionel Freedman*, 27 N.Y.2d at 368–69.

The Court finds it unnecessary to resolve the question regarding whether the Product Recall Liability classification could properly function as an exclusion under New York law, because it finds that the plain terms of the LSIC Policy dictate the entry of summary judgment for the Defendant.

The core of the Plaintiff's argument is that, at the time Menards demanded to be made whole, GTLC was not in a position to be able to do so in hard cash. (Dkt. 75, at 3). Menards refused to give back the defective products until it got what it wanted in return, and so, in its own words, "GTLC had to replace the defective product with new inventory." (*Id.*). GTLC, to try and fit this commercial exchange within the plain terms of the LSIC Policy, then goes back to

referring to the tangible light bulbs it exchanged as if they were the fungible cash it did not have on hand, arguing that "[b]ecause Menards conditioned the return on the reimbursement of the purchase price of the bulbs, these recall costs fall squarely within the plain language of the Policy."  (*Id.*).

The Plaintiff argues that "[t]o demonstrate that the loss is covered, GTLC must only demonstrate that it expended costs in order to get the defective product back."  (Dkt. 75, at 3).  This is adequate for GTLC to prevail, in its view, because "[t]he definition of 'costs' is not limited or restricted in any way by the language of the Policy."  (*Id.*).  But this flies in the face of the basic principle of New York contract interpretation that the Court must read the LSIC Policy as a whole, and not myopically scrutinize individual words and provisions in isolation.  *See N.Y. Univ. v. Factory Mut. Ins. Co.*, 374 F. Supp. 3d 315, 329 (S.D.N.Y. 2019).

In *Mount Vernon*, the policy "lack[ed] *any* language limiting coverage to 'carpentry,' and instead cover[ed] 'those sums that [the insured] [became] legally obligated to pay as damages because of 'bodily injury' or 'property damage.'"  *Mount Vernon*, 277 F.3d at 238 (emphasis in original).  The LSIC Policy is nowhere near as broadly worded, and does not require reference to the Product Recall Liability policy option to understand the limits inherent to Product Recall Expense coverage.  Viewing the definition for "[p]roduct recall expense' in the context of the whole policy, multiple elements of the definition indicate that "'the reasonable expectations of a businessperson'" in reading the Policy would not sweep as broadly as GTLC asserts.  *Parks Real Estate*, 472 F.3d at 42.

First, the definition makes clear that product recall expenses extend only to "any of the following reasonably and necessary costs."  (Dkt. 12, Ex. C, at 3).  The nature of several of the enumerated covered expenses makes clear that the coverage extends to costs that accrue from the

execution of the recall itself.  For example, the LSIC Policy specifies that covered product recall expenses include "costs to notify others" of the recall, "including but not limited to [by] print, radio, television and internet notifications."  (*Id.*).  The LSIC Policy also specifies that product recall expenses include costs involved with destroying the recalled products once recovered, and wages for overtime and some other personnel expenses involved in effectuating the recall itself. (*Id.* at 4).  The reasonable reading of these provisions is that they cover costs incidental to effectuating a recall (*e.g.*, regaining physical custody of the defective product, paying workers to carry out the recall, informing the public); it is clear that none of these provisions deal with the recalled products themselves.

The closest provision covering the claimed expenses here would seem to be one for "costs to recover **your product(s)** back to you from any purchases, distributor, or user including handling charges." (*Id.*).  The Plaintiff contends that the word "costs" in this provision is without limit, and so since Menards conditioned the return of the defective light bulbs to GTLC on its receipt of properly functioning product, the $805,807.90 in new inventory that GTLC says it provided must fall under this expansive reading of "costs." (Dkt. 70, Attach. 1, at 6). However, read in light of the aforementioned provisions, and giving the "words of the agreement their ordinary and plain meaning," *Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.*, 961 F.2d 387, 389 (2d Cir. 1992), it is clear that this is intended to reach costs of shipping and other such expenses involved with physically recovering the recalled product, and does not go so far as to reach all commercial demands that may be made on the insured by third parties.

The provision cannot be fairly read to cover the expense of making a customer whole after delivering a defective product.[2]  To stretch the language that far to encompass the costs for which the Plaintiff sues "would '[strain] [] the contract language beyond its reasonable and ordinary meaning.'"  *Law Debenture*, 595 F.3d at 467 (quoting *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 459 (1957)).  Reading the Policy as a whole, and specifically in the context of the other provisions defining "product recall expense," it is clear that the word "costs" in the operative provision cannot reasonably read to embrace the demand Menards made that GTLC make it whole before releasing the recalled light bulbs.[3]  Specifically the words "including handling charges" make clear that a reasonable commercial party purchasing Product Recall Expanse coverage would understand that this particular clause provides insurance against costs arising from the physical return of recalled products.  To read this one word "costs" in

---

[2] LSIC states that it invited the Plaintiff to submit evidence on a claim for Product Recall Expenses after it informed GTLC that the it had would not cover the costs of making Menards whole.  According to LSIC, the Plaintiff never submitted any additional information, and instead filed this lawsuit.  (Dkt. 69, Attach. 1, at 12).

[3] Somewhat confusingly, GTLC on its partial motion for summary judgment also claims that the Policy should cover its shipping and handling costs totaling $12,362.59 relating to recovery of the recalled product, as well as warehouse costs totaling $59,832.51 and liquidation damages of $647,640.  (Dkt. 70, Attach. 1, at 6–8).  The Plaintiff argues it is entitled to summary judgment on these amounts.  (*Id.*).  Whether the plain language of the Policy would cover these amounts is only a secondary question here, as is the fact the Defendant disputes the amounts, because there is no evidence in the record that GTLC ever submitted a Product Recall Expense claim for these amounts to LSIC.  The factual discrepancy here is made clear by observing that, while the Plaintiff's Statement of Materials Facts lays out its view that the disputed claim was "acknowledged" by LSIC on February 15, 2016 and "den[ied]" on April 22, 2016, the warehouse fees at least did not accrue until between May 1, 2016 (after the claim was submitted) and September 30, 2018 (after the Complaint had been filed in this litigation). (Dkt. 71, Attach. 1 ¶¶ 17, 19; Dkt. 75, Amend. Kroschel Decl., Ex. 1, at 2).  The Plaintiff did not file suit for a declaratory judgment, it sued for breach of contract.  The Court could not possibly grant summary judgment on the grounds that LSIC breached the Policy by denying a claim that was never submitted.  Because no reasonable jury could find that LSIC breached the Policy by denying a covered claim that there is no evidence the Plaintiff ever submitted, GTLC's motion for partial summary judgment on these amounts must be denied.

isolation in the manner the Plaintiff suggests would erase any limit whatsoever on the coverage provided—and reading the Policy as a whole it is clear that such a result is not reasonable.

Because the Court finds the LSIC Policy language unambiguous, and that even viewed in the light most favorable to the Plaintiff it does not cover GTLC's claims, the Court is required to enter summary judgment in favor of the Defendant on the breach of contract claim.

## B. Bad Faith, Estoppel, and Agency

### 1. Bad Faith

The Complaint brought a claim against LSIC for "bad faith . . . [that] amount[ed] to an extreme deviation from the standards of the industry." (Dkt. 1 ¶¶ 54–57). Among the Defendant's counterarguments is that no such claim exists under New York law. (Dkt. 69, Attach. 1, at 22–23). Indeed, "where a party [to a contract] is merely seeking to enforce its bargain, a tort claim will not lie." *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (1995). Yet, according to at least one later dissenter in a later case from the New York Court of Appeals, such "bad faith" claims might have found new life in the law when recast as breaches of the implied covenant of good faith and fair dealing. *See Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 198–99 (Smith, J., dissenting) ("[T]his is the first time, as far as I know, that we have relied on that implied covenant to condemn the bad faith breach of an express promise.").

Again, the Court finds it unneccesaary here to resolve this question of New York law, where it is apparent that the plain terms of the LSIC Policy does not cover the costs accrued by GTLC, and where the Plaintiff was neither thwarted by a bad faith breach of an express promise, nor deprived of the fruit of its bargain. Summary judgment for the Defendant on this claim is proper.

### 2. Estoppel and Agency Liability

GTLC's claim for agency liability against LSIC relies on the allegation that "Insure Idaho and Crouse were acing as agents" for LSIC "in advising customers like [GTLC] about LSIC policies and the sufficiency thereof." (Dkt. 1 ¶¶ 64–67). GTLC also brought a claim for estoppel against LSIC, alleging that LSIC "promised adequate insurance coverage," that the lack of such coverage caused financial harm to GTLC, and that LSIC knew or should have known that the failure to provide adequate coverage would expose GTLC to such risks. (Dkt. 1 ¶¶ 69–72).

In New York, an insurance "broker is normally the agent of the insured." *Strauss Painting, Inc. v. Mt. Hawley Ins. Co.*, 24 N.Y.3d 578, 592 (2014). "Estoppel . . . arises where an insurer acts in a manner inconsistent with a lack of coverage, and the insured reasonably relies on those actions to its detriment." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 95 (2d Cir. 2002).

GTLC has not put forward any evidence that even read in the light most favorable to it suggests that Insure Idaho and Crouse were agents of LSIC. Furthermore, there is no evidence in the record that LSIC acted inconsistent with a lack of coverage; LSIC never, for example, in any way represented that it would cover the Menards costs, and then changed its mind after GTLC had relied on that representation. *See id.* ("[E]stoppel requires a showing of prejudice to the insured."). LSIC is therefore entitled to summary judgment on the claims of estoppel and agency liability.

## <u>CONCLUSION</u>

The Plaintiff's motion for partial summary judgment is DENIED.  The Defendant's motion for summary judgment is GRANTED.  The Clerk of Court is directed to close the motions at Dockets 69, 70, and 71.  The Clerk of Court is further directed to close the case.

Dated: New York, New York　　　　　　　SO ORDERED
　　　　April 28, 2020

_____
PAUL A. CROTTY
United States District Judge

16